## UNITED STATES v. GEER et al.

(District Court, W. D. Pennsylvania. September 8, 1920.)

No. 2288.

1. **Railroads** ☞5½, New, vol. 6 A Key-No. Series—**Federal control did not suspend Hours of Service Act.**

The taking over by the government of control of the railroads for war purposes, under Act Aug. 29, 1916, § 1 (Comp. St. § 1974a), did not suspend the operation of Hours of Service Act March 4, 1907 (Comp. St. §§ 8677–8680), and officers and agents of a railroad company retained in their positions, by the Director General of Railroads, remained subject to its provisions.

2. **Master and servant** ☞17—**Unavoidable accident, within Hours of Service Act, affirmative defense.**

In an action against officers or agents of a railroad company to enforce the penalty for permitting employees to remain on duty for a longer period than 16 consecutive hours, in violation of Hours of Service Act March 4, 1907, § 2 (Comp. St. § 8678), that the case was one of unavoidable accident, within the proviso of section 3 (section 8679), is an affirmative defense, which must be specially pleaded and proved.

3. **Master and servant** ☞13—**Unavoidable delay of train no excuse for extension of hours of service.**

Delay of a train by unavoidable accident is not a license to a carrier for any officer or agent to keep the crew of such train on continuous duty over 16 hours, under the proviso in Hours of Service Act March 4, 1907, § 3 (Comp. St. § 8679); but to excuse such service it must be shown that the officer or agent made at least some effort to avoid excess service.

At Law. Action by the United States against I. W. Geer and others, officers and agents of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company. Judgment for the United States.

E. Lowry Humes, U. S. Atty., of Pittsburgh, Pa., and Monroe C. List, Sp. Asst. U. S. Atty., of Washington, D. C.

W. S. Dalzell, of Pittsburgh, Pa., for defendants.

THOMSON, District Judge. In this action, brought by the United States attorney on behalf of the United States, to recover for alleged violations of the Hours of Service Act, the parties have agreed that the cause may be heard and determined by the court; a jury being waived. The parties have also, by stipulation filed, agreed upon the following facts, which are accordingly found by the court as facts in the case:

(1) The Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company is a corporation organized and doing business under the laws of the states of Pennsylvania, Indiana, and Illinois, and prior to 12 o'clock noon, December 28, 1917, said corporation was, and since 12:01 a. m., March 1, 1920, has been, a common carrier engaged in interstate commerce by railroad in the state of Pennsylvania and other states of

the United States, with an office and place of business at Pittsburgh, Pa. The main line of said railroad extends from Pittsburgh, through Dennison and Columbus, Ohio, to St. Louis, Mo., and Chicago, Ill.

(2) For some time prior to 12 o'clock noon, December 28, 1917, defendants were officers and agents of said railroad corporation as follows: R. E. McCarty, a vice president; I. W. Geer, general superintendent; J. C. McCullough, superintendent; J. H. Adrian, assistant trainmaster; J. C. Altland, train dispatcher; and H., E. Joseph, train dispatcher. All of said officers and agents, excepting I. W. Geer, were located at Pittsburgh; Geer was located at Columbus.

(3) By virtue of that certain proclamation of the President of the United States issued on December 26, 1917, said Pittsburgh, Cincinnati, Chicago & St. Louis Railway, at 12 o'clock noon, December 28, 1917, was taken over by the United States, and was thereafter, until 12:01 a. m., March 1, 1920, in the possession and under the control of the United States, to the extent and in the manner set forth in said proclamation.

(4) In section 3 of the federal Hours of Service Act (Comp. St. § 8679) there is this proviso:

"Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen"

—which necessarily has a very important bearing upon the efficient operation of said railroad, especially in the performance of its duties to the public. In the operation thereof it was considered practically impossible for any of the operating officers, except those directly in charge of train operations at the time, to pass upon the question whether, under the circumstances, men employed in the actual operation of a train are or are not within the terms of this proviso. Therefore, in an earnest endeavor faithfully to comply with the provisions of the Hours of Service Act, the defendant R. E. McCarty, on April 27, 1915, then general superintendent of said railway company, and located at Columbus, Ohio, issued a certain order, which was in effect until some time in 1919, directing that all employees in train service should be relieved within the 16-hour period, as required by the act, unless such employees had been delayed in the completion of their run by an unavoidable accident or casualty, over which the officers had no control, and that, when so delayed, the time lost by reason of such unavoidable detention might be added to the 16-hour period. This order was transmitted to various division superintendents, including the defendant J. C. McCullough, then superintendent in charge of the division between Pittsburgh and Columbus. Accompanying this order was a list of delays that the company's various division superintendents considered to be either excusable or nonexcusable.

(5) On January 3, 1917, the board of directors of the Pennsylvania Lines West of Pittsburgh appointed said I. W. Geer general superintendent of their Southwest System, which included said Pittsburgh,

Cincinnati, Chicago & St. Louis Railway; and on July 2, 1918, said R. E. McCarty was appointed general manager thereof by G. L. Peck, federal manager having jurisdiction over said railroad.

(6) On October 22, 1918, said I. W. Geer, then general superintendent at Columbus, reissued the instructions contained in said order of April 27, 1915, transmitting a copy thereof to said J. C. McCullough, then division superintendent at Pittsburgh, who in turn transmitted the same to trainmasters, assistant trainmasters, and train dispatchers in charge of train movements between Pittsburgh and Columbus.

(7) On December 29 and 30, 1918, there were operated over the line of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway the trains mentioned in plaintiff's statement of claim, known and designated as extra east and extra west, drawn by Pittsburgh, Cincinnati, Chicago & St. Louis Railway engine No. 8043. Both of said trains were engaged in the movement of interstate freight. The following named persons composed the engine and train crews of said trains: W. W. Chaney, conductor; C. F. Kull, engineer; J. A. Bridgeman, fireman; F. F. Heath, trainman; and A. C. Combe, trainman—being the persons named in the first, second, third, fourth, and fifth counts, respectively, of said statement of claim.

(8) The members of said engine and train crews went on duty at Dennison, Ohio, at 8:45 p. m., December 29, 1918, with orders to operate their train to Pitcairn, a distance of 105 miles. After being delayed in the Dennison yards by trains ahead, they left there at 11:30 p. m. with 34 loaded freight cars, and proceeded with only the ordinary delays encountered by freight trains until they reached a point near Wheeling Junction, W. Va., about 4 miles west of a telegraph office known as "MN" Tower, which is about 1 mile from Collier, W. Va., at which point they were delayed 4 hours and 50 minutes by an unavoidable accident, the happening of which was unknown to any of said defendants until after said engine and train crews had left Dennison. This unavoidable delay necessitated a decision by the defendant J. C. Altland, who was then on duty as a train dispatcher at Pittsburgh from 6:30 a. m. until 2:30 p. m., whether he should order said engine and train crews to turn their train over to other engine and train crews at Collier, where there is located a large freight yard, but which is not a terminal, and have the delayed engine and train crews take a train back to Dennison, or whether he should continue said crews in service eastwardly, with the view of relieving them between Collier and Pitcairn at what he believed to be the proper time. Said Altland, from his own experience, and also because of the instructions heretofore referred to, believed that he had the legal right to keep the delayed engine and train crews on duty 16 hours in addition to the 4 hours and 50 minutes unavoidable delay. Therefore said Altland, after consultation with the defendant J. H. Adrian, assistant trainmaster at Pittsburgh, caused the following message to be sent Conductor Chaney, over the signature of said J. C. McCullough, at "MN" Tower.

"Pittsburgh, Dec. 30th.

"Extra 8043:

"You had 4 hours and 50 minutes legal delay account of wreck at "MN." Use this time.           J. C. McC."

Said Altland went off duty at 2:30 p. m., December 30, at which time he acquainted the defendant H. E. Joseph, who worked as train dispatcher from 2:30 p. m. until 10:30 p. m., with the situation.

(9) At the time Joseph went on duty the engine and train crews in question were on their way back to Dennison with a train of 19 loaded cars and 16 empty cars, having been so ordered by said Altland, over the signature of said McCullough. Shortly after going on duty said Joseph conferred with said Adrian, and upon the latter's instructions sent the following message, over the signature of said McCullough, to Conductor Chaney, of extra west, engine 8043:

"Pittsburgh, December 30th.

"Extra 8043:

"Do not outlaw yourselves at 5.35 p. m. If you cannot make Dennison with train, leave it at 'MB' Tower or 'OB' Tower and go in light.

"J. C. McC."

(10) The following table shows the movement of extra east and extra west, engine 8043, in detail, the distance of the several stations from Dennison, the time of arrival at and departure from these stations, and the time the engine and train crews in question had been on duty upon such arrival and departure:

| Miles. | Stations. | Time. | On Duty. | |
|---|---|---|---|---|
| | | Dec. 29. | Hrs. | Min. |
| . | Lv. Dennison, Ohio... | 11.30 p. m. | 2 | 45 |
| 9.6 | Lv. OB Tower, Ohio | 11.59 p. m. | 3 | 14 |
| 47.3 | Lv. Steubenville, Ohio | 3.03 a. m. | 6 | 18 |
| 48.7 | Ar. Wheeling Junction, W. Va. | 3.34 a. m. | 6 | 49 |
| 52.9 | Ar. MN Tower, Collier, W. Va. | 8.53 a. m. | 12 | 08 |
| 52.9 | Lv. MN Tower, Collier, W. Va. | 12.03 p. m. | 15 | 18 |
| 47.3 | Lv. Steubenville | 12.31 p. m. | 15 | 46 |
| 9.6 | Lv. OB Tower | 4.36 p. m. | 19 | 51 |
| | Ar. D. A. Tower, Dennison | 5.08 p. m. | 20 | 23 |
| Train crew relieved | | 5.30 p. m. | 20 | 45 |
| Engine crew relieved | | 5.34 p. m. | 20 | 49 |

The court finds from the evidence the following additional facts:

(11) Train movements over the Pittsburgh, Cincinnati, Chicago & St. Louis Railway between Pittsburg, Pa., and Columbus, Ohio, were, in the following relative order of superiority, under the control of the general manager, the general superintendent, the division superintendent, the trainmaster or assistant, the train dispatchers.

(12) In December, 1918, the following named defendants were the operating officials of said railroad: R. E. McCarty, general manager; I. W. Geer, general superintendent; J. C. McCullough, division superintendent; J. H. Adrian, assistant trainmaster; J. C. Altland, train dispatcher; H. E. Joseph, train dispatcher.

(13) Train operations on this railroad were carried on in practically the same manner during the federal control as before. No trains of any other railroad company were ever operated over the line of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway between Collier, W. Va., and Dennison, Ohio.

(14) The persons named in plaintiff's statement of claim and engaged in the operation of the two trains in question were, on December 29 and 30, 1918, employees of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company.

The act of March 4, 1907 (Comp. St. §§ 8677–8680), under which this action was brought, is a highly remedial statute, in the enforcement of which the employees, but more particularly the public, are vitally concerned. In this case the burden is upon the government to show that the defendants were officers and agents of the common carrier, and that they required or permitted its employees, the defendants here, to remain on duty longer than 16 hours. If such proof is offered a prima facie case is made out, and upon the defendants, who claim a defense under the proviso to section 3, is the duty to properly plead and the burden of establishing such defense. The facts agreed upon show, and the affidavit of defense concedes, that the employees named in the several causes of action set forth in the statement of claim were kept on duty continuously for 20 hours and 50 minutes on December 29 and 30, 1918. But they plead by way of defense, first, that they were not officers and agents of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company at that time; that said railroad was then under federal control; that defendants were not the employees of the railroad company, but of the federal government; and that this action therefore cannot be maintained under the act of Congress in question. Second, it is denied that the defendants required and permitted the employees named to be and remain on duty for a period in excess of the time allowed by law; that none of said defendants had any knowledge of the existence of the circumstances complained of except J. C. Altland, who was at the time complained of train dispatcher, having charge of train movements, as it was impossible for any of the operating officers, except those directly in charge of the operation of the trains, to pass upon the question whether in any given circumstances the men employed in the actual operation of the train are or are not within the terms of the proviso to section 3 of the act of Congress; that in an endeavor to faithfully comply with the act the general manager had issued an order, which was in effect at the time of the matters complained of, directing that all employees should be relieved within the 16-hour period, unless said employees had been delayed in the completion of a given duty by reason of some casualty over which the officers had no control, and that in all such cases the time during which such employees were delayed by such casualty might be deducted in computing the 16-hour period; that such order was transmitted by the general manager to the general superintendent, who in turn transmitted it to the several superintendents, and from them to the several dispatchers and trainmasters. And it is denied that the facts of the case show any breach of the Hours of Service Law.

[1] As to the first question: By the act of August 29, 1916 (Comp. St. § 1974a), the President was given power by Congress—

"in time of war * * * to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material, and equipment,

or for such other purposes connected with the emergency as may be needful or desirable."

In December of that year, war being then in progress, exercising the power thus vested in him, the President, by proclamation, took possession and assumed control of the several systems of transportation in the United States. By the proclamation a Director General of Railroads was appointed, with authority to take possession and control of the systems, to operate and administer the same for war purposes only, such control to cease upon the cessation of war. The act gave to the Director General the authority to use the services of the existing railroad officers, boards of directors, and employees to perform their duties as theretofore—

"until and except so far as said director shall from time to time, by general or special orders, otherwise provide."

In this legislation we have a conspicuous illustration of the right of the nation in time of war to exercise under the Constitution those extraordinary powers which may be deemed necessary for national protection and defense. In the presence of a great national exigency and in the interest of the whole people the powers of the nation rise superior, not only to the rights of persons, natural and artificial, but superior also to the rights of states. From the provisions of the act of Congress conferring the power, the proclamation of the President exercising that power, and the act providing for the operation of the transportation systems the legal status of the railroad companies and their officers and employees must be determined. It is clear that the corporate entity of the transportation systems is preserved; that the possession, use, and operation of the carrier, called federal control, is temporary and ceases on the cessation of the war.

Under the above legislation and the powers conferred on the President, and through him upon the Director General, the government in no sense became a common carrier, but exercised control over the carriers to the end that said systems of transportation be utilized for the transportation of troops, war material, and equipment to the exclusion, so far as may be necessary, of all other traffic thereon.

Keeping in view the purpose, and only purpose, of the legislation, it would be very anomalous if the existing acts of Congress, such as the safety appliance acts, the hours of service acts, and others passed solely for the purpose of protecting the public, should be held to be suspended or repealed, and that the nation could not thus exercise the extraordinary powers of government for national preservation without temporarily invalidating the existing legislation passed for the protection of the traveling public. To prevent any such harmful construction of the act, it is provided in section 10 of the Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j):

"That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President."

This seems to me conclusive of the question. The legal status of the carrier while under federal control is fixed by the act of Congress, and that act expressly makes the carrier while under federal control subject to all laws and liabilities as common carriers.

I do not understand this position to be in conflict with the case of the Northern Pac. R. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897. That case involved only a question of the right of the state of North Dakota to control intrastate rates during the federal control of railroads. Nothing in the opinion warrants the inference which defendants' counsel seek to draw therefrom that the defendants here are exonerated from liability because of the federal control of the carrier. It follows, therefore, that the first position taken by defendants' counsel cannot be sustained.

[2, 3] Turning to the second question, the liability of the defendants under the facts, the act makes it unlawful to require or permit service of trainmen over 16 hours, unless such service is necessitated by an unavoidable accident. The prohibition is against the carrier or any officer or agent permitting such excess service. It has been held that the penalty applies, not to the crew as a unit, but to each individual member who is kept in the service overtime. Excess service may be justified under the facts, but the excuses embodied in the proviso are separate and affirmative defenses which must be specially pleaded and established. United States v. K. C. S., 202 Fed. 828, 121 C. C. A. 136; and cases cited. The authorities also establish that a delay to a train by an unavoidable accident is not a license to a carrier for any officer or agent to keep the crew of such train on duty over 16 hours. To excuse such service it must be shown that the officer or agent made at least some effort to avoid excess service. A., T. & S. F. v. United States, 244 U. S. 336, 37 Sup. Ct. 635, 61 L. Ed. 1175, Ann. Cas. 1918C, 794; United States v. A., T. & S. F. (D. C.) 236 Fed. 154; G., C. & S. F. v. United States, 255 Fed. 753, 167 C. C. A. 99. It is also true that an officer or agent requires and permits excess service whenever he fails to prohibit it. O.-W. R. & N. v. United States, 223 Fed. 596, 139 C. C. A. 142.

In 1915 the defendant McCarty was general superintendent at Columbus, and in April of that year he issued the instructions to his subordinates, the compliance with which was the cause of the excess service of the employees in question. Later McCarty became vice president, and in July, 1918, general manager. During all this time he allowed these instructions to remain in effect. In 1917 the defendant Geer was appointed general superintendent at Columbus, and in October of 1918, he reissued said instructions. The excess service complained of was performed in the state of Ohio in December, 1918; the order requiring the service being issued at Pittsburgh. Yet, in May, 1917, the Circuit Court of Appeals for the Sixth Circuit had declared unlawful the very thing embodied in these instructions. This was followed in June by the decision of the Supreme Court of the United States, which made a similar ruling. Notwithstanding this conclusive interpretation of the law, the instructions in question

were allowed to remain in full force until some time in 1919, and as a result excessive service of train and engine crews was required and permitted.

The defendants do not plead a necessity for the excess service in question, nor that the same could not have been avoided, nor was evidence introduced to show any causal connection between the unavoidable accident and the excess service. The defendants Altland and Adrian caused the message requiring excess service to be sent to Conductor . Chaney. Joseph did not attempt to avoid service over 16 hours; he and Adrian, in sending the second message, were concerned only in avoiding service over 20 hours and 50 minutes.

The defendants may have been mistaken as to the law of the case and the legal duty resting upon them under the circumstances toward the employees under their control. But this does not answer the case. It does not relieve the carrier, its officers and agents, from a very diligent effort to avoid exceeding the limits of service specified by the act of Congress, and which should be so construed as to effectuate the humane purpose of its enactment. Under the law applicable to the facts of the case, I find the defendants jointly and severally liable to the plaintiff on the five several causes of action set forth in the statement of claim.